**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ITRIA VENTURES, LLC,**

        **Appellant/Cross-Appellee,**

**v.**

**WILLIAM C. O'KEEFE,**

        **Appellee/Cross-Appellant.**

**5:20-cv-1193**
**(GLS)**

_____

**APPEARANCES:**        **OF COUNSEL:**

**FOR THE APPELLANT/**
**CROSS-APPELLEE:**
Barclay Damon LLP        TERESA M. BENNETT, ESQ.
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

**FOR THE APPELLEE/**
**CROSS-APPELLANT:**
Bankruptcy Law Center        THEODORE L. ARAUJO, ESQ.
PO Box 698
Syracuse, NY 13201

**Gary L. Sharpe**
**District Judge**

## MEMORANDUM-DECISION AND ORDER

### I.  Introduction

Appellant/Cross-Appellee Itria Ventures, LLC appeals, and

Appellee/Cross-Appellant William C. O'Keefe cross-appeals, from a

judgment and Memorandum-Decision and Order of the Bankruptcy Court (Cangilos-Ruiz, C.J.), (Dkt. No. 4, Attach. 10 at 2) (hereinafter "Bankr. MDO") filed on September 11, 2020, which: (1) found $35,011.59 of O'Keefe's debt owed to Itria nondischargeable pursuant to 11 U.S.C. § 523(a)(6), and (2) dismissed Itria's cause of action under 11 U.S.C. § 523(a)(4).  For the reasons that follow, Bankruptcy Court's judgment is affirmed.

## II. Background

O'Keefe worked for Syracuse Pool Center, Inc. (hereinafter "the Company"), which sold pool-related accessories, and performed construction and installation of pools, hot tubs, and spas.  (Bankr. MDO at 2.)[1]  In 2001, O'Keefe purchased the Company and became "its principal and sole shareholder."  (*Id.* at 3.)

In March 2018, O'Keefe entered into a "Future Receivables Sale Agreement" (hereinafter "the Agreement") with Itria.  (*Id.*)  Under the Agreement, the Company received $190,000 in funds in exchange for the future receivables of the Company, in the amount of $254,600, defined to

---

[1]  The facts, to the extent that they are not in dispute by the parties, are taken from the Bankr. MDO.

include "not only accounts receivable of the Company but also accounts of subsidiaries and affiliated companies, and upon a material breach, the accounts of any new company controlled by [O'Keefe]."  (*Id.*)  As part of the Agreement, Itria received a security interest in "all accounts receivable of the Company [,] . . . the receivables of any other person or entity whose accounts are included in Future Receivables [,] . . . all Company property used in its business, including equipment and inventory[,] and . . . the property of any successor company or guarantor."  (*Id.* at 3-4.)  Itria did not perfect this security interest.  (*Id.* at 4.)  The Agreement provided that $505.16 would automatically be deducted from the Company's operating account each business day as payment under the Agreement until either $228,000 was paid on, or before, September 20, 2018, or the entire $254,600 was paid in full.  (*Id.*)

At the end of 2018, given that the Company was not "making any money," the Company decided that it would terminate its business operations.  (*Id.*)  Beginning in August 2018, and continuing through September 2018, the Company gradually terminated all employees and ceased all work.  (*Id.* at 5)  "By February 2019, the Company was subject to eviction."  (*Id.*)

3

During this time, O'Keefe attempted to liquidate the Company's inventory.  (*Id.*)  O'Keefe sold $9,589.44 worth of inventory to Tarson Pools, which was "well below" the wholesale value of the goods.  (*Id.*)  O'Keefe testified at trial that this was the only alternative to disposing of the goods.  (*Id.*)  O'Keefe elected to accept the payment from Tarson Pools through a company owned jointly by O'Keefe and a relative, rather than through the Company, allegedly in satisfaction of a debt owed by the Company.  (*Id.*)  Further, O'Keefe gave a "passerby" free of charge fifty of the Company's solar covers, which retailed for $100 each.  (*Id.* at 5-6.)  All other inventory was thrown away.  (*Id.* at 5.)

The company "officially" ceased operations in February 2019.  (*Id.* at 6.)  On February 19, 2019, O'Keefe closed the Company's operating account, and withdrew $7,336.15 of the remaining $7,790.63 balance, considering this to be his back-pay for the prior three months in which he "had not taken a paycheck."  (*Id.*)  However, there were no FICA or social security taxes taken from this lump-sum.  (*Id.*)

On February 20, 2019, the Company filed for bankruptcy.  (*Id.* at 7.)  Upon the closing of the operating account, $141,114, plus "costs, fees[,] and interest," was still owned to Itria under the Agreement, and, on March

4

28, 2019, Itria obtained a judgment against the Company in the amount of $178,720.68.[2]  (*Id.* at 6.)

After O'Keefe closed the Company, he opened Syracuse Pool Pros, as a sole proprietor, and began doing "the same kind of business as the Company did but on a much smaller scale."  (*Id.* at 8.)  O'Keefe used the same email account, phone number, and P.O. box for Syracuse Pool Pros as he used for the Company.  (*Id.*)  The Company's website also remained active, and when O'Keefe received a business inquiry through the website he would either "notify[] [the inquirer] that the Company was out of business, direct[] them to other businesses that could help them with what they needed or, if it was something he could perform, inform[] them that he could help."  (*Id.*)  Syracuse Pool Pros had "approximately 200 to 250 customers that were prior customers of the Company."  (*Id.*)

There were eight outstanding work contracts when the Company ceased operations.  (*Id.* at 9.)  O'Keefe completed these contracts, and kept the payment received, a total of $12,086.  (*Id.*)  Further, O'Keefe performed numerous jobs from April 2019 though September 2019, "some

---

[2]  O'Keefe "was not joined in [this] action as he had already invoked bankruptcy protection."  (Bankr. MDO at 6.)

of [them] . . . for former customers of the Company." (*Id.*)  To complete these jobs, he used equipment owned by the company, notably, a "dump truck," which had an ascribed rental value of $1,200.  (*Id.*)

In May 2019, Itria filed an adversary complaint, seeking to deny O'Keefe a discharge of the debt due to it.  (*See generally* Dkt. 4, Attach. 1.) O'Keefe answered the complaint by general denial.  (Bankr. MDO at 1.) After a trial was conducted, the Bankruptcy Court issued a Memorandum-Decision and Order, determining that $35,011.59 of O'Keefe's debt to Itria was nondischargeable pursuant to 11 U.S.C. § 523(a)(6), and dismissing Itria's cause of action under 11 U.S.C. § 523(a)(4).  (Bankr. MDO at 22.)

### III.  Standard of Review

District courts have jurisdiction to hear both interlocutory and final appeals from bankruptcy court orders and judgments.  *See* 28 U.S.C. § 158(a).  On an appeal, "a district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  *Acee v. Oneida Savings Bank*, 529 B.R. 494, 496-97 (N.D.N.Y. 2015).  In exercising its appellate jurisdiction, the district court reviews findings of fact for clear error and conclusions of law de novo.  *See R² Invs., LDC v. Charter Commc'ns, Inc. (*In re *Charter*

*Commc'ns, Inc.)*, 691 F.3d 476, 483 (2d Cir. 2012).  "The court reviews mixed questions of law and fact either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual."  *Hilton v. Wells Fargo Bank, N.A.*, 539 B.R. 10, 15-16 (N.D.N.Y. 2015) (citation omitted).  A factual finding is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Marsh USA, Inc. v. Bogdan Law Firm (*In re *Johns-Manville Corp.*), 802 F. App'x 20, 23 (2d Cir. 2020) (citation omitted).

## IV.  Discussion

### A.  Itria's Appeal

Itria contends that Bankruptcy Court erred in dismissing its cause of action under 11 U.S.C. § 523(a)(4).  (Dkt. No. 10 at 10-12.)  This section of the Bankruptcy Code excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).  To prevail on a claim under § 523(a), a plaintiff must prove each element by a "preponderance of the evidence."  *See Adamo v. Scheller (*In re *Scheller)*, 265 B.R. 39, 51 (Bankr. S.D.N.Y. 2001). Section 523(a)'s exceptions to discharge are strictly construed in favor of

debtors in keeping with the fresh-start policy underlying the Bankruptcy Code.  *See Zohlman v. Zoldan*, 226 B.R. 767, 771 (S.D.N.Y.1998).

Courts narrowly construe the term "fiduciary" for purposes of § 523(a)(4), "so that it does not reach ordinary debtor-creditor transactions in which the debtor merely violated the terms of [its] commercial agreement with the creditor."  *Michaels Electrical Supply Corp. v. Castagnola (*In re *Castagnola)*, No. 14-75123, 2017 WL 1337176, at *4 (Bankr. E.D.N.Y. Apr. 11, 2017) (citation omitted).  "[F]or purposes of § 523(a)(4), who is a fiduciary is a matter of federal law."  *Id.* (internal quotation marks and citation omitted).

Under federal law, the term "fiduciary" only applies to technical or express trusts.  *See Hyman v. Danzi (*In re *Danzi)*, No. 09-77669, 2010 WL 3811843, at *3 (Bankr. E.D.N.Y. Sept. 27, 2010).  "An express trust is created by a formal written agreement, while a technical trust may be created by state statute or common law doctrine that imposes a trust-like obligation on the debtor."  *Id.* at *3 (citation omitted).  "State law determines whether an express or technical trust exists."  *In re Castagnola*, 2017 WL 1337176 at *4 (internal citations omitted).

Itria did not argue to Bankruptcy Court that an express trust existed,

8

nor do they now.  (Dkt. No. 10 at 10-12.)  Instead, they contend that a technical trust existed by virtue of the trust fund doctrine.  (*Id.*)  Under the trust fund doctrine, directors of an insolvent corporation hold the remaining corporate assets "in trust" for the benefit of creditors.  *See, e.g.*, *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541,549 (N.Y. 2000) (citation omitted); *see also Pappas v. Gucciardo (*In re *Gucciardo*), 577 B.R. 23, 34 (Bankr. E.D.N.Y. 2017) (finding that the duty created by the trust fund doctrine "meets the requirements of fiduciary capacity under § 523(a)(4)").

With respect to this claim, Bankruptcy Court concluded that Itria failed "to present adequate evidence that the Company was insolvent under New York law."  (Bankr. MDO at 12).  Bankruptcy Court noted that under New York law, to demonstrate insolvency, one must "show that the [entity] was unable, not simply unwilling, to pay its liabilities as they became due.  (*Id.* at 12 (citing N.Y. Bus. Corp. Law § 102(8) (McKinney).)  Specifically, Bankruptcy Court held that "[t]he record [wa]s devoid of evidence as to the Company's outstanding liabilities, when payments were due[,] and whether the Company had sufficient funds to pay its debts as they became due."  (*Id.*)  Bankruptcy Court noted that the only evidence

presented regarding the Company's alleged insolvency was O'Keefe's "subjective opinion that the Company was not profitable enough to keep the business going[,]" and that "the Company was being evicted by its landlord." (*Id.*)  Bankruptcy Court further cited to the fact that, on the day before the Company filed for bankruptcy, the Company had $7,790.63 in its operating account, which was sufficient to pay the required debt to Itria ($505.16). (*Id.* at 13.)  Because Bankruptcy Court determined there was not enough evidence to indicate insolvency, it made no other findings with respect to § 523(a)(4).

On appeal, Itria contends that "[c]ontrary to . . . Bankruptcy Court's conclusion, the clear evidence in this case established that the Company entered the zone or vicinity of insolvency in September of 2018, when [O'Keefe] began to engage in conduct intended to prevent the Company from paying its liabilities." (Dkt. No. 10 at 12.)  Thus, Itria claims Bankruptcy Court's "factual conclusion was clearly erroneous." (*Id.* at 10.)

In support of this argument, Itria notes that O'Keefe stated that the Company "wasn't making any money," O'Keefe "began terminating all of his employees until he was the only employee left at the company," he "increased his own salary and withdrew all of the funds in the [C]ompany's

10

operating account," the Company "was unable to pay any of its bills, including its rent and its obligations to [Itria] under the Agreement," O'Keefe "retained inventory, equipment, customer lists, contracts, website, telephone number[,] and any other asset of the Company that could generate income for his future venture, and disposed of the rest," O'Keefe directed payment under a Company contract to another entity he co-owned "to keep such funds out of the reach of the Company's creditors," and, finally, he deposited funds generated from the Company's liquidation into his own bank account.  (*Id.* at 11-12.)

When exercising its appellate jurisdiction, district courts review "mixed questions of law and fact either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual."  *Hilton*, 539 B.R. at 15-16 (citation omitted).  Bankruptcy Court's determination that insolvency was not sufficiently demonstrated was predominantly a finding of fact and will be reviewed under the clear error standard.[3]  For the reasons discusses in the Bankr. MDO, (Bankr.

---

[3]  Although Itria's appeal of Bankruptcy Court's finding with respect to insolvency is framed as an appeal of a factual finding, (Dkt. 10 at 9 ("such factual conclusion was clearly erroneous")), to the extent Itria argues that Bankruptcy Court erred by applying the "cash-flow" test to determine insolvency, (Bankr. MDO at 12 ("Itria must show that the Company was unable . . . to pay its liabilities as they became due")), and failed to consider whether the Company was in the "zone" or "vicinity" of insolvency, this would be a conclusion of law and

MDO at 12-13), the determination that there was insufficient evidence of the Company's insolvency was not clearly erroneous, and, thus, Bankruptcy Court's judgment is affirmed in that regard.

Itria further contends that Bankruptcy Court erred in determining that, under § 523(a)(6), the consequences of O'Keefe's willful and malicious conduct cannot be extended to "the fruits of [O'Keefe's] personal services." (Dkt. No. 10 at 22).

Section 523(a)(6) excepts from discharge any debt, "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "[T]o be non-dischargeable within the context of § 523(a)(6), a debt must arise from an injury that is both willful and malicious." *Woods v. Alexander (*In re *Alexander)*, 503 B.R. 19, 22 (Bankr. W.D.N.Y. 2013). Bankruptcy Court correctly determined that O'Keefe's conduct was both willful and malicious.[4] (Bankr. MDO at 15-20.)

---

would be reviewed de novo, *see In re Charter Commc'ns*, 691 F.3d at 483.

Under this standard of review, Bankrupcty Court's judgment would still be affirmed. *See* N.Y. Bus. Corp. Law § 102(8) (McKinney) ("'Insolvent' means being unable to pay debts as they become due in the usual course of the debtor's business."); *see also RSL Communs. PLC v. Bildirici*, 649 F. Supp. 2d 184, 207 (S.D.N.Y.2009) ("Plaintiff has adduced no support under New York law for its argument that Defendants owed a fiduciary duty of care . . . to . . . creditors during the thirty-to sixty-day period in which Plaintiff argues that [company] was in the zone of insolvency." (internal quotation marks and citation omitted)).

[4] *See infra* Part IV.B.

Itria does not dispute this finding.  (Dkt. No. 10 at 18-21.)

Rather, Itria disputes Bankruptcy Court's holding that O'Keefe's conduct cannot be extended to "the fruits of [O'Keefe's] personal services." (Dkt. No. 10 at 22.)  Bankrupcty Court reached this conclusion because "[c]ourts in New York apply the [successor in interest] doctrine where the successor in interest is a corporation, not an individual," and because Bankruptcy Court was "unaware of any case where, under New York law, an individual, even one acting as a sole proprietor doing business under another name, has been held to be a successor in interest to a corporate entity."  (Bankr. MDO at 20-21.)

Itria contends that this conclusion was reached in error, because "[r]efusing to impose liability as a successor simply because the individual is savvy enough to know that he need only not incorporate the new business to avoid successor liability creates an enormous loophole in the law of successor liability."  (Dkt. No. 10 at 23.)  It further claims that Bankruptcy Court improperly relied on the definition of "business entity" in the context of mergers, rather than of successor liability, and "there is no requirement stated or otherwise that the successor [in interest] be a 'business entity.'"  (*Id.* at 24.)  Finally, Itria asserts that Bankruptcy Court

failed to consider relevant factors in determining whether the successor in interest doctrine should apply, "includ[ing] transfer of management, personnel, physical location, good will [,] . . . general business operation, continuity of officers, identical phone and fax numbers, use of same website address, receipt of predecessor's assets, whether the business operations remained unchanged, and whether the transfer rendered the predecessor with no funds, business assets or employees." (*Id.* at 23 (internal quotation marks and citations omitted).)

Bankruptcy Court's conclusion as to the inapplicability of the successor in interest doctrine to individuals is a conclusion of law and will be reviewed de novo. *See In re Charter Commc'ns*, 691 F.3d at 483.

Even if Bankruptcy Court erred in its analysis of *Hamilton Equity Group, LLC v Juan E. Irene, PLLC*, 101 A.D. 3d 1703 (4th Dept. 2012), when concluding that "business entity" in New York does not include "natural persons," Bankruptcy Court's ultimate conclusion is correct. Because the court is unaware of any case where, under New York law, an individual has been held to be a successor in interest to a corporate entity, (Bankr. MDO at 20-21), and that holding otherwise would run afoul of the Thirteen Amendment and numerous provisions of the Bankruptcy Code

14

that indicate a desire to protect an individual's future income, (*id.* at 21-22),

the court affirms Bankruptcy Court's judgment in this regard.[5]

Itria cites several cases in its brief which it claims address this issue,

and conclude in their favor.  (Dkt. No. 10 at 24-25).  However, none of

these cases stand for the proposition that an individual may be held as a

successor in liability to a corporate entity under New York law.  *See In re*

*Bernard*, 87 F.2d 705 (2d Cir. 1937); *Frankel v. Frankel (*In re *Frankel)*, 77

B.R. 401 (Bankr. W.D.N.Y. 1987); *Rel Com. Corp. v. Materetsky, (*In re

*Materetsky)*, 28 B.R. 499 (Bankr. S.D.N.Y. 1983).

### B.    O'Keefe's Appeal

O'Keefe contends that Bankruptcy Court erred in determining that his

conduct was willful pursuant to 11 U.S.C. § 523(a)(6), and, therefore, the

entirety of the debt to Itria should have been discharged.  (Dkt. No. 12 at

14-15.)

This section of the Bankruptcy Code excepts from discharge any

debt, "for willful and malicious injury by the debtor to another entity or to

---

[5]  Bankruptcy Court did not err by failing to analyze the successor in interest factors that Itria claims it should have in its brief, (Dkt. No. 10 at 23), as those factors are irrelevant given the conclusion of Bankruptcy Court, which is affirmed here, that this doctrine is inapplicable to an individual under New York law.  (Bankr. MDO at 20-21.)  Further, the court need not address Itria's contention regarding fraud under 11 U.S.C. § 523(a)(4), as this claim is foreclosed given that there was no fiduciary duty owed by O'Keefe to Itria.

the property of another entity."  11 U.S.C. § 523(a)(6).  "Willful" denotes, "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  *Marguiles v. Hough (*In re *Margulies)*, 517 B.R. 441, 452 (S.D.N.Y. 2014) (citation omitted).  Willfulness is demonstrated by showing that debtor acted with the "subjective intent to cause injury" *or* "objective knowledge that his acts were substantially certain to cause injury."  *United States v. Shelmidine (*In re *Shelmidine)*, 519 B.R. 385, 391-92 (Bankr. N.D.N.Y. 2014) (citations omitted).

O'Keefe asks "how could the disposal of inventory that has no value cause injury?",  (Dkt. No. 12 at 14), in support of his position.

Bankruptcy Court's determination that O'Keefe acted willfully involves a mix of questions of law and fact, and, in an abundance of caution, will be reviewed de novo.  *See Hilton*, 539 B.R. at 15-16 (citation omitted).

In cases of conversion of collateral, "courts have inferred willful injury upon proof that the debtor intended to improperly dispose of the creditor's collateral and used the proceeds for purposes other than payment of the secured debt."  *In re Shelmidine*, 519 B.R. at 392 (internal quotation marks and citation omitted).  For this reason, and the other reasons described in the Bankr. MDO, (Bankr. MDO at 15-19), Bankruptcy Court did not err in

determining that O'Keefe acted willfully with respect to his conversion of the Company's secured collateral.

O'Keefe further contends that Bankruptcy Court erred in determining that his conduct was malicious pursuant to 11 U.S.C. § 523(a)(6).  (Dkt. No. 12 at 15-16.)

"Malice" is defined as "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will."  *Navistar Fin. Corp. v. Stelluti (*In re *Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996) (citations omitted).  Malice may be implied "by the acts and conduct of the debtor in the context of the surrounding circumstances."  *Ball v. A.O Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (citation omitted).  Implied malice can be demonstrated by showing that the debtor "deliberately and intentionally committed an act which he knew would necessarily injure a cognizable right of the creditor."  *In re Shelmidine*, 519 B.R. at 393 (citation omitted).

In support of his position, O'Keefe asks "where is the malice?" given that he completed outstanding contracts of the Company at a loss, "cleaned out the retail establishment when he could've just left the inventory there," and where the inventory he discarded had no resale value.  (*Id.* at 15.)

Bankruptcy Court's determination that O'Keefe acted maliciously involves a mix of questions of law and fact, and, in an abundance of caution, will be reviewed de novo.  *See Hilton*, 539 B.R. at 15-16 (citation omitted).

Malice can be implied by showing that the debtor "deliberately and intentionally committed an act which he knew would necessarily injure a cognizable right of the creditor." *In re Shelmidine*, 519 B.R. at 393 (citation omitted).  This is just what O'Keefe did.  He withdrew funds from the Company's operating account, and he acknowledged that this would prevent Itria from collecting the payments due under the Agreement.  (Dkt. No. 4, Attach. 7 at 39.)  Further, he completed the Company's contracts and kept payment for himself, in spite of the fact that these funds were secured collateral under the Agreement.  (Dkt. No. 4, Attach. 3 ¶ 14; Dkt. 4, Attach. 8 at 11.[6])  O'Keefe also disposed of company inventory, which he had no right to do under the Agreement, at below-wholesale prices, or, with respect to the pool covers, for no value at all.  (Bankr. MDO at 5-6.) Finally, O'Keefe used the Company's equipment to complete work for Syracuse Pool Pros, and in exchange for no value.  (*Id.* at 9.)  For these

---

[6] Citations to Dkt. 4, Attach. 8 refer to the CM/ECF-generated page number(s).

reasons, and the others discussed in the Bankr. MDO, (Bankr. MDO at 14-19), Bankruptcy Court's judgment is affirmed in that regard.

Finally, O'Keefe contends that Bankruptcy Court erred in awarding damages. (Dkt. No. 12 at 16-19.) Specifically, he claims that the damages related to the pool liners that he gave away to the "passerby," and to the inventory he sold at below-wholesale prices were erroneously granted "as a matter of law," and that his methods of disposal were not improper as the items were valueless. (*Id.* at 17.) He also claims that, with respect to the Company's contracts that he completed individually after closing the Company, the proper measure of damages is not the proceeds he received, but, rather, "the difference between the contract price and the costs of completing the work left undone," as would be awarded when a contractor "walk[s] off the job." (*Id.* at 18-19.)

Bankruptcy Court's application of the facts to the laws regarding damages is a mixed question of law and fact, and, in an abundance of caution, will be reviewed de novo. *See Hilton*, 539 B.R. at 15-16 (citation omitted). The inventory sold at below-wholesale prices was clearly not valueless, as O'Keefe received $9,389.44 in exchange for the inventory, and the method of disposal was not proper given that he had no right

19

under the Agreement to dispose of it.  (Bankr. MDO at 5-6.)  Further, while

he now contends that the solar covers were valueless, the parties

stipulated to their $100 per-unit value.  (Dkt. No 4, Attach. 3 ¶ 16.)  Finally,

with respect to the Company's contracts that were completed by O'Keefe,

his allegation that damages were measured incorrectly is not persuasive.

O'Keefe completed these contracts and retained the proceeds derived

from them, these proceeds clearly constitute Itria's secured collateral,

consisting of "all accounts, chattel paper, deposit accounts, documents,

fixtures, general intangibles, instruments, equipment and inventory,"

including "all proceeds of such property."  (Dkt. 4, Attach. 8 at 11.)  For

these reasons, and the others articulated in the Bankr. MDO, (Bankr. MDO

at 13-22), Bankruptcy Court's determination of damages is affirmed.

O'Keefe makes additional contentions in the "statement of the case"

of his brief, many of which he does not revisit in the argument section.[7]

(Dkt. No. 12 at 2-10.)  For many of these contentions, it is unclear how they

relate to O'Keefe's appeal, but, to the extent these contentions are

pertinent to O'Keefe's appeal regarding Bankruptcy Court's findings of

---

[7] For example, he maintains that Itria "limited their damages claim at trial" to $22,000. (Dkt. No. 12 at 3-4.)

malice, willfulness, and damages, for the reasons that are stated above

and discussed in the Bankr. MDO, (*see generally* Bankr. MDO),

Bankruptcy Court's judgment and order is affirmed.

## V.  <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the September 11, 2020 judgment of the Bankruptcy

Court is **AFFIRMED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

September 30, 2021
Albany, New York

Gary L. Sharpe
U.S. District Judge